IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDY KOSTOVSKI-TALEVSKA, | ) | |
| | ) | CASE NO. 5:13-CV-655 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 14). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Sandy Kostovski-Talevska's ("Plaintiff") application for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.  For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance benefits on February 24, 2010. (Tr. 114-17).  Plaintiff alleged she became disabled on August 30, 2001 due to suffering from a minor stroke and fast brain activity, depression, neurocardiogenic syncope (fainting), fibromyalgia, panic attacks, anxiety, migraines, dizziness, muscle twitching, and facial pain. (Tr. 139).  The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 76-81).

At Plaintiff's request, administrative law judge ("ALJ") James Hill convened an administrative hearing on October 11, 2011 to evaluate her application. (Tr. 30-65).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), Mary Beth Kovar, also appeared and testified. (*Id.*).  During the hearing, Plaintiff amended her original disability onset date to October 22, 2008. (Tr. 38-39).

On October 25, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 11-23).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 6).  The Appeals Council denied the request for review, making the ALJ's October

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

25, 2011 determination the final decision of the Commissioner. (Tr. 1-3).  Plaintiff now seeks

judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  EVIDENCE

### A.  Personal Background

Plaintiff was born on August 31, 1973, and was 36 years old on the date last insured. (Tr.

36).  Accordingly, she was considered as a "younger person" for Social Security purposes. *See*

20 C.F.R. §§ 404.1563(c).  Plaintiff has at least a high school education and has past relevant

work as a cashier and a stock clerk. (Tr. 38, 61).

### B.  Medical Evidence

The relevant time period is from Plaintiff's alleged onset date, October 22, 2008, through

her date last insured, December 1, 2009.[2]  Accordingly, the undersigned will focus on evidence

that relates to Plaintiff's alleged period of disability or that is relevant to her appeal.

On May 5, 2004, Plaintiff presented to Robert Kunkel, M.D., complaining of "constant

head and face pain." (Tr. 236).  Dr. Kunkel indicated Plaintiff's facial and neck pain was "mostly

muscular," with stress and somatization probably the most important factors in the etiology. (Tr.

237).  In December 2004, Plaintiff underwent a tilt table test, the results of which were positive

for neurocardiogenic syncope.[3] (Tr. 254-55).

On February 28, 2005, Plaintiff followed up with cardiologist Dinakar Satti, M.D., for

her dizziness and fainting. (Tr. 262).  Plaintiff had self-discontinued Florinef and Midodrine,

which were prescribed to increase her blood pressure, because she complained they caused a pins

---

[2] To obtain disability insurance benefits, a claimant must prove that the onset of disability was prior to the expiration of his insured status and that disability lasted for a continuous period of twelve months. 42 U.S.C. § 423(d)(1)(A).

[3] "Neurocardiogenic syncope happens when part of your nervous system that controls blood flow changes your heart rate and lowers your blood pressure for a short time. Then, less blood flows to your brain and you may faint." The Mayo Clinic, *available at* http://www.mayoclinic.org/tests-procedures/tilt-table-test/basics/why-its-done/prc-20019879 (last visited April 28, 2014).

and needles feeling throughout her body.  Despite discontinuing her medication, Plaintiff indicated feeling better and was without dizziness or syncopal episodes.  As a result, Dr. Satti recommended Zoloft and encouraged her to increase sodium intake. (*Id.*).

In June 2005, Plaintiff presented to Dr. Satti for recurrent dizziness and "near syncopal episodes." (Tr. 261).  Plaintiff stated she initially felt better on Zoloft, but when her symptoms returned, she stopped the medication.  As symptoms became worse, she re-started Zoloft.  Plaintiff's physical examination was normal, showing clear lungs and a regular heart rhythm.  The doctor suggested increasing the dosage of Zoloft, but she refused.  As a result, Dr. Satti prescribed that Plaintiff continue her present course of the drug. (*Id.*).

Plaintiff did not seek medical treatment again until January 2007, when she presented to John Andrefsky, M.D., a neurologist and sleep medicine specialist. (Tr. 299).  Plaintiff's physical and neurological examinations were essentially normal, but she complained of headaches. (Tr. 299-300).  The doctor indicated Plaintiff had not been compliant with Cymbalta, but she had begun to take it on a regular basis. (Tr. 300).  Dr. Andrefsky recommended an MRI and MRA of the brain, a diagnostic polysomnogram (sleep study), and weight loss. (*Id.*).

On February 27, 2007, Plaintiff returned to Dr. Andrefsky, who reported that the brain MRI was normal, aside from a right frontal venous angioma and an 8 mm left cerebral subcortical white matter. (Tr. 296).  Plaintiff's MRA was normal.  The diagnostic polysomnogram was consistent with upper airway resistant syndrome. (*Id.*).  Dr. Andrefsky opined that Plaintiff was "normal" from a neurological standpoint. (Tr. 297).  Due to Plaintiff's tearfulness during the examination, the doctor was concerned that psychological issues significantly contributed to her condition. (*Id.*).  Dr. Andrefsky recommended a cardiology consultation because of the abnormal tilt table test. (Tr. 298).

Plaintiff underwent another polysomnogram on March 5, 2007, which was positive for obstructive sleep apnea, and was prescribed a continuous positive airway pressure ("CPAP") machine. (Tr. 332-33).  On March 30, 2007, Plaintiff returned to Dr. Andrefsky for headaches, occasional pain over her left eye, and dizziness. (Tr. 293).  The doctor confirmed that Plaintiff was neurologically stable and recommended the following: continuing Cymbalta, starting to use the CPAP machine, weight loss, a cardiology consult (because treatment of low blood pressure may relieve dizziness), and an MRI of the cervical spine. (Tr. 294).

On April 2, 2007, Plaintiff saw Dr. Satti, and reported feeling lightheaded and dizzy. (Tr. 260).  Dr. Satti opined that Plaintiff was doing fair and that he was unsure how compliant she was with his treatment recommendations.  He prescribed sodium chloride and questioned whether Plaintiff would comply.  Dr. Satti also indicated that because of fluid retention, it appeared Plaintiff was not aggressive with hydration and salt intake, as recommended. (*Id.*).

On May 7, 2007, rheumatologist Rafael Arsuaga, M.D., examined Plaintiff. (Tr. 366).  A trigger point test for fibromyalgia revealed no trigger points, which Dr. Arsuaga opined suggested psychogenic rheumatism, not fibromyalgia. Though Plaintiff worried about having small vessel disease, Dr. Arsuaga wrote that he found no evidence of a vasculitic process (the inflammation of a vessel wall). The doctor suggested checking for a major connective tissue disorder, though he was doubtful that Plaintiff suffered from it. (*Id.*).

On May 10, 2007, Dr. Andrefsky examined Plaintiff for complaints of daily headaches. (Tr. 291).  Dr. Andrefsky noted Plaintiff's cervical spine MRI showed a small central C5/C6 disc herniation without otherwise significant stenosis.  Plaintiff's physical examination, motor skills, and neurological examination were normal. (Tr. 291-92).  Dr. Andrefksy observed that Plaintiff needed to use her CPAP machine, because it could resolve her headaches. (Tr. 292).

5

On May 29, 2007, Plaintiff treated with John Westerbeck, M.D., an internal medicine specialist. (Tr. 405).  Plaintiff complained of untreated sleep apnea and diffuse pain in her neck, shoulders, and upper back, but indicated she wished to avoid medication as much as possible. Dr. Westerbeck encouraged Plaintiff to use her CPAP machine and wrote that "if we treat her sleep apnea, get her sleeping better, many of her symptoms will improve." (*Id.*).

Neurologist J.C. Taber, M.D., examined Plaintiff in June 2007. (Tr. 466).  He opined that the venous angioma was "of no consequence," and that the cervical spine MRI was "fairly unremarkable with some cervical spondylosis and degenerative disc disease at C5-6."  (*Id.*).

On June 5, 2007, Dr. Arsuaga wrote that an extensive workup had been performed, which showed no evidence of a vasculitic disorder or an autoimmune connective tissue disorder. (Tr. 467).  The doctor opined that "her symptoms are consistent with psychogenic rheumatism and internalization of her stress and anxiety."  Dr. Arsuaga concluded that Plaintiff required psychotherapy more than a rheumatologist, and referred her to a local psychiatrist. (*Id.*).

Plaintiff returned to Dr. Westerbeck on June 18, 2007, and the doctor reiterated that improving her sleep would resolve many of her problems. (Tr. 406).  On July 9, 2007, Plaintiff reported to Dr. Westerbeck that she felt poorly and was experiencing increased sinus pressure and drainage. (*Id.*).  Plaintiff's physical examination was normal. The doctor indicated that she ought to stop smoking. (*Id.*).  In August and September 2007, Plaintiff treated with Dr. Westerbeck, complaining of ear pain, primarily on the left side. (Tr. 408). Dr. Westerbeck diagnosed acute otitis media and temporomandibular joint disorder. (*Id.*).

In March 2008, Plaintiff presented to the Aultman West Immediate Care Center with complaints of chills, fever, cough, and body aches. (Tr. 420).  She was diagnosed with bronchitis and prescribed medication. (Tr. 421).

From what appears to be December 2008 to February 2009, Plaintiff treated with Frankie Roman, M.D., a sleep specialist. (Tr. 382-96).  On February 23, 2009, Dr. Roman diagnosed hyper somnolence and snoring, without obstructive sleep apnea. (Tr. 385).  Plaintiff reported that she had stopped taking Provigil because she did not like it, and that while she slept well on Elavil, she wanted to discontinue it. (Tr. 383-85).  Dr. Roman recommended continuing her medication, smoking cessation, cognitive behavioral therapy, regular exercise, stress management, and weight loss. (Tr. 386).

On April 29, 2010, Plaintiff underwent a one-time consultative examination with Lokendra Sahgal, M.D. (Tr. 500-02). Dr. Sahgal observed Plaintiff had no difficulty moving in the examination room or getting off and on the examination table, though she acted as though was in severe pain and was dramatic. (Tr. 501).  A physical examination showed normal findings aside from tenderness in the inter-scapular area, base of the neck, and sacroiliac joints. (Tr. 501-02).  Plaintiff's muscle strength in all extremities was 5/5.  Plaintiff had no muscle spasms, no abnormal reflexes, and was able to hold things, write, and dress without assistance.  Plaintiff's range of motion throughout the spine and extremities was normal. (*Id.*).

Dr. Sahgal opined that Plaintiff's ability to lift or carry was "somewhat impaired due to her chronic muscle aches and back pain from fibromyalgia," but Plaintiff had no difficulty handling objects and her ability to grasp with both hands was normal.  (Tr. 502).  Plaintiff was not limited in her ability to climb, balance, stoop, kneel, or crawl.  Plaintiff experienced some pain with bending and squatting and was not able to walk on her heels or toes, due to poor balance.  However, Plaintiff was able to walk normally without any assistance.  Dr. Sahgal also observed that Plaintiff's mental acuity was not normal, in that Plaintiff was hyper and displayed symptoms of obsessive-compulsive disorder. (*Id.*).

7

On June 1, 2010, Plaintiff began treating with Donald Zimmerman, M.D. (Tr. 546-48). Dr. Zimmerman treated Plaintiff four times over a period of six months. (Tr. 546-56).  In June, Plaintiff's physical examination was normal, aside from Dr. Zimmerman's note of "multiple trigger points," on muscular/skeletal examination. (Tr. 547).   Dr. Zimmerman requested Plaintiff's previous records and counseled her to stop smoking. (*Id.*).

In July 2010, Dr. Zimmerman indicated that he had reviewed Plaintiff's old medical records. (Tr. 549).  As to Plaintiff's past medical history, the doctor noted that Plaintiff used a natural treatment for hypothyroidism, had a positive tilt table test in 2004, her brain MRI was negative, she treated with Dr. Pellegrino for fibromyalgia, and she had a negative EGD in 2010. While Plaintiff told Dr. Zimmerman that she was treating with Dr. Pellegrino, there do not appear to be any treatment notes from Dr. Pellegrino, or any other fibromyalgia specialist aside from rheumatologist Dr. Arsuaga, in the record. (*Id.*).  Dr. Zimmerman believed there was little he could do to improve Plaintiff's symptoms, and noted that Plaintiff was already seeing Dr. Pellegrino, who was more sophisticated in the field of fibromyalgia. (Tr. 550).  Aside from advising Plaintiff to see a gynecologist, Dr. Zimmerman made no recommendations. (*Id.*).

On October 5, 2010, Plaintiff returned to Dr. Zimmerman with complaints of heartburn, diarrhea, constipation, fibromyalgia, dizziness, and fatigue. (Tr. 552).  Plaintiff's physical examination was normal, aside from enlarged tonsils and multiple trigger points. (Tr. 553).  Dr. Zimmerman opined that Plaintiff had gastroesophageal reflux disease ("GERD") and recounted the various symptoms Plaintiff voiced.   He stated that Plaintiff was "totally nonfunctional." (*Id.*).

Dr. Zimmerman filled out a medical source statement describing Plaintiff's physical limitations on October 5, 2010. (Tr. 535-36).  Among other limitations Dr. Zimmerman opined

that Plaintiff could (1) lift no more than ten pounds occasionally and no weight frequently; (2) stand or walk for a total of two hours of an eight hour day, in thirty minute increments; (3) sit for a total of six hours, in twenty to sixty minute increments; (4) rarely or never climb, balance, stoop, crouch, but occasionally kneel and crawl; (5) rarely or never reach, push or pull, perform gross manipulation; (6) occasionally handle, feel, and perform fine manipulation. He also indicated that Plaintiff needed additional workday rest breaks every fifteen minutes.

On January 5, 2011, Plaintiff presented to Dr. Zimmerman complaining of right hand numbness, right leg twitching, and left side head tingling. (Tr. 555).  Dr. Zimmerman noted Plaintiff's syncope episodes, headaches, mild symptoms of irritable bowel function, and that she was being treated by Dr. Pellegrino for fibromyalgia.  Dr. Zimmerman concluded that Plaintiff was "stable" but suffered from somatic complaints without specific diagnosis. (Tr. 556).

On June 9, 2011, Dr. Zimmerman completed a second medical source statement. (Tr. 600-01).  He opined that Plaintiff was more severely limited than he found in October 2010, and recommended that Plaintiff could (1) lift no more than five pounds occasionally and no weight frequently; (2) stand or walk for a total thirty minutes in an eight hour day; (3) sit for a total of one hour; (4) rarely or never climb, balance, stoop, crouch, kneel, and crawl; (5) rarely or never reach, push or pull, perform gross manipulation; (6) occasionally handle, feel, and perform fine manipulation.  He indicated that Plaintiff required workday breaks every five minutes.

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

2. The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of October 22, 2008 through her date last insured of December 31, 2009.

3. Through the date last insured, the claimant had the following severe impairments: neurocardiogenic syncope, fibromyalgia, hypotension, depressive disorder, and panic disorder without agoraphobia.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except the claimant cannot climb ladders, ropes, or scaffolds and can only occasionally climb ramps and stairs. In addition, the claimant must avoid all exposure to hazards such as dangerous machinery and unprotected heights. Further, the claimant can understand, remember and carry out simple instructions and perform simple, routine tasks. However, the claimant requires a low stress work environment with relatively few changes in work setting or work processes and without strict quotas or fast-paced high production demands. Lastly, the claimant can occasionally interact with coworkers but should avoid contact with the public.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7. The claimant was born on August 31, 1973 and was 36 years old, which is defined as a younger individual age 18-49, on the date last insured.

8. The claimant has at least a high school education and is able to communicate in English.

. . .

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October [22, 2008], the alleged onset date, through December 31, 2009, the date last insured.

(Tr. 13-22) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental

impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

# VI.  ANALYSIS

### A.  Plaintiff's Treating Physician

Plaintiff contends that the ALJ erred in failing to grant controlling weight to the opinion of her treating physician, Dr. Zimmerman.  Dr. Zimmerman treated Plaintiff from June 2010 to January 2011.  In October 2010 and June 2011, the doctor completed medical source statements describing his opinions as to the extent of Plaintiff's physical limitations.

In her brief, Plaintiff recounts the reasons the ALJ provided for attributing "little weight" to Dr. Zimmerman's October 2010 medical source statement and argues that these reasons were insufficient to comply with the treating source doctrine.  Plaintiff does not address the doctor's June 2011 statement and makes no direct argument attacking the ALJ's analysis of it.  Thus, the undersigned will limit review to the ALJ's assessment of Dr. Zimmerman's October 2010 medical source statement.

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history.  *Id.*; 20 C.F.R. § 404.1527(c)(2).  Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The treating source's opinions are not entitled to such deference, however, if they are unsupported by the medical data in the record, or are inconsistent with the other substantial evidence in the record.  *See Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL

229979, at *2 (6th Cir. Nov. 7, 1991) (Table).  When the treating physician's opinions are not entitled to controlling weight, the ALJ must apply specific factors to determine how much weight to give the opinion.  _Wilson_, 378 F.3d at 544, _see_ 20 C.F.R. § 404.1527(c)(2)-(6).  The regulations also advise the ALJ to provide "good reasons" for the weight accorded to the treating source's opinion. 20 C.F.R. § 404.1527(c).  Regardless of how much weight is assigned to the treating physician's opinions, the ALJ retains the power to make the ultimate decision of whether the claimant is disabled.  _Walker v. Sec'y of Health & Human Servs._, 980 F.2d 1066, 1070 (6th Cir. 1992) (_citing King v. Heckler_, 742 F.2d 968, 973 (6th Cir. 1984)).

In the present case, the undersigned finds that the ALJ provided sufficient reasons for his decision to grant less than controlling weight to Dr. Zimmerman's opinions.  First, the ALJ observed that Dr. Zimmerman completed the medical source statement and treated Plaintiff outside of the relevant period. (Tr. 20). The Sixth Circuit has recognized "that a treating physician's opinion is 'minimally probative' when the physician began treatment after the expiration of the claimant's insured status." _Swain v. Comm'r of Soc. Sec._, 379 F. App'x 512, 517 (6th Cir. 2010) (_quoting Siterlet v. Sec'y of Health & Human Servs._, 823 F.2d 918, 920 (6th Cir. 1987)).  Here, the ALJ explained that Dr. Zimmerman completed the October 2010 medical source statement approximately ten months after Plaintiff's date last insured. (Tr. 20). Additionally, the ALJ noted that the doctor's treatment notes began in June 2010, indicating that Dr. Zimmerman was not a treating physician before Plaintiff's insured status expired. (_Id._).

The ALJ also noted that Dr. Zimmerman's treatment history of Plaintiff was rather limited.  The ALJ assessed that "treatment records from June 2010 until October 2010 indicate a short treatment history and only a few consultations." (Tr. 20).  As the regulations explain, when evaluating medical opinion evidence, the ALJ may consider the length of treatment relationship

13

and frequency of examination.  *See* 20 C.F.R. § 404.1527.  "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." *Id.*  Here, before completing the medical source statement, Dr. Zimmerman treated Plaintiff on three occasions over the course of five months.  While the parties do not dispute that this amount of treatment qualified Dr. Zimmerman as a "treating source," the ALJ was correct in observing that this shorter treatment history resulted in a more limited understanding of Plaintiff's condition and impairments than might have been developed had Dr. Zimmerman treated Plaintiff more often or for a longer period of time.  As a result, this was an appropriate reason, when combined with others, to give less weight to the doctor's opinions.

Additionally, the ALJ found that Dr. Zimmerman's treatment notes did not support a finding that Plaintiff was limited to the degree Dr. Zimmerman recommended during the period for which she alleges disability.  As Plaintiff points out, Dr. Zimmerman reviewed at least some portion of Plaintiff's prior treatment records after he first examined Plaintiff in June 2010. (Tr. 548).  In July and October 2010, Dr. Zimmerman provided in his treatment notes a review of Plaintiff's "past medical history," which explained that Plaintiff used a natural thyroid for her hypothyroidism, had a positive tilt table test in 2004, the results of her brain MRI were insignificant, and she treated with Dr. Pellegrino for fibromyalgia. (Tr. 549).  Beyond these brief statements, which provide little insight into Plaintiff's earlier symptoms and limitations, the doctor does not otherwise address Plaintiff's condition during the relevant period.  As a result, Dr. Zimmerman's treatment notes provide little support for the degree of limitations the doctor suggested Plaintiff displayed during her period of disability.

14

Plaintiff argues that doctor's opinion is relevant to the period of disability because she had the same complaints of fatigue, myalgia pain, and dizziness prior to her date last insured as she reported to Dr. Zimmerman.  She also asserts that objective medical evidence in the form of trigger point testing, a cervical spine MRI, and a positive tilt table test supported these complaints.

The Sixth Circuit has explained that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004).  Evidence of the claimant's condition after the date last insured is relevant to the disability decision only if the evidence "relate[s] back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003).

Here, some of the complaints Plaintiff voiced to Dr. Zimmerman arose before the expiration of her date last insured.  As a result, the October 2010 medical source statement was arguably based in part on these complaints and relevant.  The ALJ acknowledged the report's relevance and did not dismiss it entirely.  Nonetheless, while the report may have been relevant, substantial evidence supports the ALJ's conclusion not to grant controlling weight.

Moreover, the objective evidence Plaintiff claims substantiates her complaints of disabling limitations, does not provide such support.  As to muscle pain, rheumatologist Dr. Arsuaga, M.D., performed a trigger point test that revealed no trigger points, resulting in the doctor's diagnosis of psychogenic rheumatism, for which Plaintiff did not subsequently seek treatment. (Tr. 366).  Regarding Plaintiff's cervical spine, her physicians indicated that the results of her MRI were relatively unremarkable.  Dr. Andrefsky noted Plaintiff's MRI showed a small disc herniation without otherwise significant stenosis, and Dr. Taber likewise related that

the MRI was "fairly unremarkable with some cervical spondylosis and degenerative disc disease at C5-6." (Tr. 291, 466).  Finally, Plaintiff had a positive tilt table test and was diagnosed with neurocardiogenic syncope, but the mere diagnosis of a condition does not speak to its severity or indicate the functional limitations caused by the ailment.  *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990).  Furthermore, treatment notes indicate Plaintiff's failure to comply with treatment to help alleviate her alleged fainting spells and to pursue referrals to a cardiologist for her low blood pressure. (Tr. 260, 294, 298).

Plaintiff also contends that the ALJ erred by failing to address each of the factors denoted in 20 C.F.R. § 416.927(c)(2) when explaining the weight he attributed to Dr. Zimmerman's opinion.  But, Plaintiff has not identified, and the Court is unaware of, any binding case law demanding an ALJ to specify how he analyzed each of these factors individually.  The regulations only require the ALJ to provide "'good reasons . . .  for the weight . . .  given to the treating source's opinion' –not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (alterations in original).  The "good reasons" requirement only demands the ALJ to *consider* the factors provided in 20 C.F.R. § 416.927. *Blanchard v. Comm'r of Soc. Sec.*, No. 11-CV-12595, 2012 WL 1453970, at *16-17 (E.D. Mich. Mar. 16, 2012), *R&R adopted* 2012 WL 1432589.  While including a thorough assessment of each factor might be helpful in assisting a claimant to better understand the ALJ's decision, so long as the ALJ's opinion clearly conveys why the doctor's opinion was credited or rejected, the ALJ has satisfied his burden. *Francis*, 414 F. App'x at 804.  Given that the ALJ provided sufficient reasons for his treating source analysis, remand is not warranted.

### B. Plaintiff's Credibility

Next, Plaintiff takes issue with the ALJ's assessment of her credibility.  It is the ALJ's responsibility to make decisions regarding the credibility of witnesses, and the ALJ's credibility determinations are entitled to considerable deference. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Id*.  Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (*quoting* SSR 96-7p).

In evaluating whether a claimant is disabled by pain, this circuit has established a two part test. *Rogers*, 486 F.3d at 243.  The ALJ must consider (1) whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objectively established medical condition is of a level of severity that it can reasonably be expected to produce the claimant's alleged symptoms. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)*; Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).

When evaluating the credibility of a plaintiff's allegations of pain, the ALJ should consider a number of factors in addition to the objective medical evidence. *Walters*, 127 F.3d at 531; 20 C.F.R. § 404.1529(c)(2).  These other factors may include: statements from the claimant and the claimant's treating and examining physicians; diagnoses; efforts to work; the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating

and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *See Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 20 C.F.R. §§ 404.1529(a), (c)(3); SSR 96-7p, 1996 WL 374186, at *3.

In the present case, Plaintiff maintains that the ALJ failed to fully discuss each of the regulation's credibility factors when evaluating her credibility.  However, the regulations do not mandate a discussion of all of the relevant credibility factors; an ALJ may satisfy his obligations by considering most, if not all, of the factors. *See Bowman v. Chater*, 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).  Here, a review of the ALJ's decision shows that the ALJ considered and evaluated most of the applicable factors.

For example, the ALJ acknowledged Plaintiff's allegations that she suffered from neurocardiogenic syncope, fibromyalgia, panic attacks, migraines, dizziness, muscle twitching, and facial pain. (Tr. 17).  He recounted that Plaintiff's hearing testimony included claims that she experienced a great deal of pain, she cannot travel, and she cannot stand for more than fifteen minutes. (*Id.*).  He observed that Plaintiff alleged her impairments affected her ability to stand, walk, climb stairs, remember, and concentrate. (*Id.*).  In the context of Plaintiff's allegations, the ALJ considered additional credibility factors.  For example, the ALJ noted Plaintiff's numerous prescription medications and why they were prescribed; statements from healthcare professionals; Plaintiff's daily activities; and the frequency of Plaintiff's complaints of symptoms, such as dizziness or fibromyalgia pain, to her doctors. (Tr. 14, 17-19).

The ALJ provided adequate reasons for discounting Plaintiff's credibility.  These reasons include a lack of objective evidence supporting Plaintiff's complaints.  For example, the ALJ

18

observed that Plaintiff's rheumatologist, Dr. Arsuaga, referred her to a psychiatrist because there was no physiological evidence to account for her symptoms of diffuse pain in her neck, shoulders, and back. (Tr. 17, 365-66).  The ALJ cited to Dr. Arusaga's examination reports which showed no evidence of fibromyalgia trigger points, vasculitic disorder, or autoimmune connective tissue disorder, prompting the doctor to recommend psychotherapy. (*Id.*).  As the ALJ further observed, there is no evidence that Plaintiff complied with the referral. (Tr. 17-18).

Additionally, the ALJ observed that Plaintiff's course of medical treatment was relatively infrequent, despite her complaints of disabling pain and other symptoms.  For example, the ALJ noted Plaintiff's relatively normal and routine treatment in 2007. (Tr. 17).  The ALJ further observed that from 2008 to 2009, the alleged period of disability, the "record shows relatively infrequent trips to the doctor for the allegedly disabling symptoms." (*Id.*).  These observations are supported by the evidence.  In particular, from Plaintiff's alleged onset date to her date last insured, it appears that Plaintiff was treated for bronchitis and evaluated by sleep specialist Dr. Roman, but otherwise apparently did not receive medical attention.  Plaintiff does not point to medical treatment from this time period supporting her claims.

The ALJ also noted statements from Dr. Sahgal, who conducted a physical examination of Plaintiff, which drew into question Plaintiff's credibility. (Tr. 19).  Dr. Sahgal observed that Plaintiff tended to exaggerate her symptoms and act as though she was in severe pain. (Tr. 19).  However, the ALJ noted the doctor's observation that Plaintiff was able to maneuver the examination room and she had no difficulties getting on or off the examination table. (*Id.*).

Additionally, the ALJ discussed inconsistencies in Plaintiff's statements.  "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should

have the opposite effect." *Rogers*, 486 at 247-48.  For instance, in her "Function Report," Plaintiff opined that she could walk only half a mile and would require a thirty minute rest break, but Plaintiff later indicated to Dr. Sahgal that she could walk approximately two miles without difficulty. (Tr. 18-19, 184, 501).

Plaintiff purports that the ALJ's opinion disregarded many of her complaints by failing to discuss them in his opinion.  She notes that the ALJ did not address her syncope episodes that caused her to pass out several times daily, her need to hold onto walls when standing or walking due to fear of fainting, myalgia pain associated with dizziness and fatigue, and her statements that pain medications had not alleviated her symptoms.  However, the ALJ did recognize a number of such allegations, including Plaintiff's dizziness (Tr. 17), her fibromyalgia pain (Tr. 17), and her syncope. (Tr. 18).  While the ALJ did not specifically address Plaintiff's statement that her medications were not helpful, he discussed a number of Plaintiff's medications and indicated that some were discontinued due to purported side effects. (Tr. 19).  The ALJ did not opine that Plaintiff's medications cured her symptoms.  Furthermore, an ALJ can consider all of the evidence without expressly addressing in his written opinion every piece of evidence submitted by a party. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (*quoting Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Here, a review of the ALJ's decision reveals that the ALJ adequately accounted for Plaintiff's account of her symptoms and limitations.  Accordingly, remand is not warranted.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.   Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  May 28, 2014.